# UNITED STATES DISTRICT COURT

## DISTRICT OF HAWAII

| | |
|---|---|
| CHARMAYNE PULE, DOLLY ANDRADE, and DONNA FALEMALU, <br><br> Plaintiffs, <br><br> vs. <br><br> BOBBY L. MACOMBER, DARRYL GRACE SR., DONOVAN CHO, HERMAN KIHE, TRAVIS LEINONEN, THOMAS PUA, SARONA KAWAAUHAU, LEONA GRACE, BETTY ANDRADE, EDWARD KAWAAUHAU, JOSEPH KIHE, THELMA MACOMBER, REBECCA LEINONEN, ROBERTA CHO, JOHN DOES 11-50, JANE DOES 7-50, DOE CORPORATIONS 1-50, DOE PARTNERSHIPS 1-50, DOE ENTITIES 1-50, and DOE GOVERNMENTAL UNITS 2-50, <br><br> Defendants. | CIV. NO. 17-00193 DKW-KJM <br><br><br> **ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS THE THIRD AMENDED COMPLAINT FILED MAY 26, 2017** |

Before the Court is Defendants' Motion to Dismiss the Third Amended Complaint Filed May 26, 2017 ("MTD"). Dkt. No. 22. The Court GRANTS the MTD as to Counts III, IV and V to the extent these counts intended to assert independent tort claims against Defendants. The allegations underlying these

counts may nonetheless form the basis of the declaratory and/or injunctive relief sought elsewhere by Plaintiffs. The MTD is DENIED in all other respects for the reasons that follow.

## BACKGROUND

This lawsuit arises out of a 2013 dispute over the election of officers at Kahikolu Congressional Church ("Church" or "Kahikolu"), located in Kona, Hawai'i.

*Factual Background—Church Governance*

Charmayne Pule, Dolly Andrade ("Dolly"), and Donna Falemalu (collectively "Plaintiffs") allege that during an Annual General Membership Meeting on or about March 24, 2013, they were elected as officers of the Church—Moderator, Vice-Moderator, and Secretary, respectively—pursuant to the Kahikolu Congressional Church By-Laws. Third Am. Compl. ¶ 11; Dkt. No. 18 [hereinafter TAC]; *see* Valencia Decl. in Supp. of Pls.' Opp'n to MTD, Ex. B [2009 By-Laws], Dkt. No. 25-3. Plaintiffs were "formally installed in their offices" for two-year terms on April 7, 2013. TAC ¶ 11; *see* 2009 By-Laws, Art. VII ("The officers of Kahikolu Congressional Church . . . . shall serve terms of two years consecutively."). Plaintiffs' two-year terms would have expired on April 7, 2015, but on February 28, 2015, at a "Special Meeting" Plaintiffs called themselves, they assert that the congregation amended the 2009 By-Laws in order to "extend the

2

terms of the Officers until a specific time period after the final resolution of this litigation." TAC ¶¶ 11, 16; Valencia Decl., Ex. C [2015 By-Laws], Dkt. No. 25-4.

Bobby L. Macomber, Darryl Grace Sr., Donovan Cho, Herman Kihe, Travis Leinonen, Thomas Pua, Sarona Kawaauhau, Leona Grace, Betty Andrade, Edward Kawaauhau, Joseph Kihe, Thelma Macomber, Rebecca Leinonen, and Roberta Cho (collectively "Defendants") belong to an alleged faction within the congregation who claim that none of those individuals elected in April 2013 continue to hold positions as officers of the Church at this time. Reply in Supp. of MTD at 13, Dkt. No. 26. According to Defendants, Falemalu resigned from her position on September 11, 2013,[1] and Pule and Dolly were removed from office during a Special Meeting on October 13, 2013.[2] Decl. of Counsel in Supp. of

---

[1] Defendants represent that Plaintiff Falemalu not only resigned as a Church officer before serving her two-year term, but later withdrew her Church membership altogether. *See* Alan Andrade Decl., Exs. C [Sept. 11, 2013 E-mail], D [Oct. 18, 2015 E-mail], Dkt. No. 22-3 at 28–31. Falemalu, however, claims that she withdrew her resignation before Moderator Pule could accept it; that she "continued to be and to function as the Secretary" thereafter; and that after informing Macomber of her intent, "he accepted [her] as Secretary in writing." Valencia Decl., Ex. E at 27–35 [Falemalu Decl.] ¶¶ 1, 4, 5, 15, Dkt. No. 25-6 at 27–29. Indeed, Falemalu states that Defendants are taking her messages out of context. Falemalu Decl. ¶ 13, Dkt. No. 25-6 at 31 (claiming the messages were an attempt to "somehow 'politely'. . . withdraw[] as a member of [Macomber's] group" within the Church, but not to withdraw from the Church itself").

[2] On October 9, 2013, at least seven of the Defendants and a number of other Church members signed a written request for a "special meeting to be held on October 13, 2013 to discuss . . . disciplinary action" for Pule and Dolly arising out of an altercation that had occurred at the Pulpit between Macomber's group and Plaintiffs the previous week. Decl. of Counsel, Ex. 1-F at 8–9 [Special Meeting Request (Oct. 9, 2013)], Dkt. No. 22-3 at 39–40. Plaintiffs did not attend the Special Meeting, but Church members who did voted by secret ballot to "[r]escind the election" of each of them. Decl. of Counsel, Ex. 1-F at 1–5 [Special Meeting Minutes (Oct. 13, 2013)], Dkt. No. 22-3 at 33–37.

MTD, Ex. 1-A [Alan Andrade Decl.] ¶ 8, Dkt. No. 22-3 at 6 ("[Plaintiffs] have not been re-elected by the Church congregation and their term expired on April 2015."). Defendants do not recognize the 2015 By-Laws "because they were created and allegedly enacted while the Church was under an administrative freeze by the Department of Commerce and Consumer Affairs ['DCCA'],"[3] which Plaintiffs "initiated" sometime after they were terminated as officers on October 13, 2013.[4] Alan Andrade Decl. ¶¶ 8–10.

At their first General Membership Meeting as Church officers on April 21, 2013, a "surprise" motion was made from the floor to elect Defendant Bobby Macomber ("Macomber") as the new "Pastor" or "Kahu" of the Church. Kahikolu had been without a full-time pastor since approximately August 26, 2012. TAC ¶¶ 18, 23–27. Plaintiffs complain that the subsequent hand-vote taken in Macomber's presence violated procedures set forth in the 2009 By-Laws.[5]

---

[3] Pule and Dolly allegedly wrote to the DCCA informing them of the Church governance dispute and requesting a "freeze" on Church records. Decl. of Counsel, Ex. 1-C at 4–5 [Pule/Dolly Letter (Oct. 22, 2013)], Dkt. No. 22-3 at 26–27. In response, the DCCA would "no longer accept any filings with respect to this entity" until this dispute has been resolved. Decl. of Counsel, Ex. 1-C at 2–3 [DCCA Letter (Oct. 25, 2013)], Dkt. No. 22-3 at 24–25.

[4] The 2015 By-Laws were allegedly ratified on February 28, 2015, prior to the expiration of Plaintiffs' two-year terms on April 7, 2015. TAC ¶¶ 11, 15.

[5] Those By-Laws provide for a Nominating Committee, appointed by the Moderator at a special meeting in January, to facilitate the selection of various officers, which would take place by an election "held at a general meeting . . . to be called by the Moderator," and that voting "shall be by ballot." 2009 By-Laws, Art. X. "Meetings for the purpose of *calling* a minister shall be announced from the pulpit two (2) Sundays prior to the general membership meeting," and "the terms of the agreement between Kahikolu Congressional Church and its minister shall be

Plaintiffs also claim that they were not yet "sufficiently knowledgeable" to recognize the April 21, 2013 election error in time to prevent it. TAC ¶ 27; Valencia Decl., Ex. E at 10–26 [Dolly Decl.] ¶ 12, Dkt. No. 25-6 at 12 ("[B]ecause this was the first meeting of the Plaintiffs as Officers, and because it was a surprise Motion from the floor, we neglected to check the By-Laws regarding the 'calling' of a Kahu."). Plaintiffs aver that they "have made a consistent and continuing good faith effort" to "correct their error" in the intervening years. TAC ¶ 28; *e.g.*, Falemalu Decl. ¶ 16(d) (recounting a Special Meeting on November 17, 2013, properly noticed and called, at which "the Congregation discussed . . . Macomber and then voted 37 to 0 (by secret ballot) to remove [him] [as Kahu] and sever all of Kahikolu's ties with him"), Dkt. No. 25-6 at 32–33. But Defendants claim that any procedural deficiencies in Macomber's 2013 election have since been cured, and that Macomber is officially the Church's current Kahu.[6] *See* Mem. in Supp. of

_____

governed by covenant." *Id*. at Art. XI. In addition to procedural deficiencies, Plaintiffs note that no pre-election vetting of the ministerial candidate took place. TAC ¶ 29 (Macomber "never applied to [and has never] been interviewed by the Pastoral Search Committee" formed under the 2009 By-Laws, nor had he yet been ordained); 48(a)–(g) (detailing "facts regarding Defendant Macomber's background, qualification and fitness to serve as Kahu" that were unknown prior to the election). Plaintiffs also assert that Macomber declined their offer to enter into a covenant with the Church and that he has never been "installed" as the Church's minister. TAC ¶¶ 30, 47. *Accord* Decl. of Counsel, Ex. 1-B [FOF/COLs, Civil 14-1-063K (May 29, 2014)] at FOFs 19–22 (procedural deficiencies); 23 (never applied); 24 (not installed); 25 (he "admitted" that he "ha[d] no contract or covenantal agreement to be the [Church's] minister"), Dkt. No. 22-3 at 10–22.

[6]Indeed, Defendants claim that any technicalities when Macomber was initially "called" were eventually corrected on July 10, 2016, when the congregation affirmed Macomber as the Church's permanent Kahu. Decl. of Counsel, Ex. 1-L [Membership Meeting Minutes (July 10, 2016)], Dkt. No. 22-3 at 63–66. Defendants claim that this re-election result is binding because,

MTD at 4–5, Dkt. No. 22-1 (citing Decl. of Counsel, Exs. 1-A [Alan Andrade Decl.], 1-I [Leona Grace Decl.], 1-M [Travis Leinonen Decl.])).[7]

Plaintiffs allege that Macomber's actions "with the approval of the other Defendants" in the wake of the April 21, 2013 General Membership Meeting were contrary to the 2009 By-Laws and longstanding Church customs and practices.[8] For example, Defendants allegedly changed Church policies on scheduling meetings and making church-wide announcements from the pulpit. TAC ¶¶ 31–32.[9] Plaintiffs also assert that despite a provision in the 2009 By-Laws that "[a]ll

---

among other things, the election was properly noticed and conducted by Moderator Alan Andrade, who they argue is the true, current Moderator. *Cf.* Reply at 6 ("[A]ccording to the 2009 bylaws which control[,] Plaintiffs are no longer officers of the church."). Alan Andrade was purportedly elected during the same special meeting on October 13, 2013 at which attendees also voted to rescind the elections of Pule as Moderator and Dolly Andrade as Vice-Moderator. Alan Andrade Decl. ¶¶ 1, 2, 31, Dkt. No. 22-3 (claiming to have served as Moderator since November 2015); Special Meeting Minutes (Oct. 9, 2013), Dkt. No. 22-3 at 33–38.

[7]Leona Grace claims to be the Church's current Treasurer, serving since April 2013. Grace Decl. ¶¶ 1, 2, Dkt. No. 22-3 at 51. Travis Leinonen claims to "currently serve as the chairperson of the [Church's] Board of Trustees," and has been serving in that capacity "since January 2016." Leinonen Decl. ¶ 1, Dkt. No. 22-3 at 69.

[8]Plaintiffs state that Macomber was advised that such modifications required approval of the congregation. *See* Valencia Decl., Ex. E at 42–51[Leslie Decl.] ¶¶ 14, 15, Dkt. No. 25-6 at 44–45. However, he "indicated that he believed that the approval of the Congregation was not necessary, because such decisions come 'from the top down.'" TAC ¶ 38.

[9]During Sunday Services on October 6, 2013, Defendants Bobby Macomber and Jade Medeiros allegedly told Plaintiffs "rudely and loudly" that "there would no longer be any standard operational or business 'announcements from the Pulpit'" despite long-standing practices; they attempted to prevent Dolly Andrade, as Vice-Moderator, from making such an announcement regarding upcoming meetings to take place on October 21 and 27, 2013; and "Defendant Macomber then stated that if the . . . Moderator or Vice Moderator[] wanted to make . . . operational or business announcements in the future, those announcements had to be in writing and given to him two (2) weeks in advance, and that if he decided they were appropriate . . , the

6

projects shall be approved by the congregation," and that any "[c]ontracts shall be sent to the Financial committee prior to release [of payment] to ensure that sufficient funds are available" (2009 By-Laws, Art. IX, Dkt. No. 25-3), Macomber unilaterally revised building plans for a Tsunami Restoration Project and dispersed funds in conjunction with that project without any approval (TAC ¶¶ 22–40, 43–44, 46). Moreover, the state court concluded that, as a matter of law, "Plaintiffs will likely prevail on the merits and will be able to prove that the purported Special Meeting on October 13, 2013 was invalid," so Plaintiffs assert that their elected positions were never rescinded. *See* FOF/COLs at COL 4.

Plaintiffs also argue that Defendants conspired with the Kona Police to intimidate Plaintiffs and dissuade them from resisting Macomber as the Church Kahu. TAC ¶ 56. For example, on November 14, 2013, Dolly allegedly received a call from Kona Police Officer Darren Cho, who is a relative of Church member (and a Macomber follower) Donovan Cho, and who is close friends with other Macomber "followers." TAC ¶ 58. At Officer Cho's request, Dolly drove to the police station to discuss a court hearing scheduled for the next day regarding an assault-and-battery Dolly suffered at the hands of a Macomber follower in the Church parking lot on October 27, 2013. TAC ¶¶ 53–55, 57. But before meeting

---

announcements would be placed in that Sunday's program." Falemalu Decl. ¶¶ 7, 8, Dkt. No. 25-6 at 29–30. *See also* TAC ¶¶ 31, 51, 52.

with Officer Cho, Dolly allegedly spoke to the Chief of the Kona Police, who indicated that he was aware of and "wanted to discuss" the written invitation that had gone out regarding the planned November 15, 2013 meeting. TAC ¶ 59. And rather than discussing the upcoming hearing as he had represented, Dolly alleges that Officer Cho questioned her "about the scheduled meeting the next night . . . (which he said would be 'Trespassing'), and [that Officer Cho] tried to get [Dolly] to cancel or reschedule that meeting" at another location. TAC ¶¶ 60, 61 ("Officer Cho indicated that he believed that none of the Plaintiffs had any right to enter . . . Church property[.]").

Dolly therefore showed Officer Cho various pieces of evidence demonstrating Plaintiffs' elected status as Church officers, including the 2009 By-Laws, a copy of DCCA records listing the Church's principal officers, and a copy of the minutes from the March 24, 2013 meeting at which they were elected. TAC ¶ 63. "Officer Cho and/or the Kona Police made and kept copies" of these documents (TAC ¶ 64), yet "when Defendant Darryl Grace Sr. reported to the Kona Police on the evening of November 15, 2013 that 'someone had entered into the Kahikolu grounds without permission,'" uniformed police officers, including Officer Cho, "went to the Kahikolu property, disrupted the Plaintiffs' meeting regarding Kahikolu Church matters, and interrogated various Members of the Congregation about what the Police described as a trespass onto Kahikolu

property" (TAC ¶ 66). *See* TAC ¶¶ 67 (alleging that "Officer Cho and/or the Police Chief and/or the Kona Police" also arranged for the Big Island SWAT Team to be in the area that evening "to support Officer Cho and [other] the Policemen"), 73 (noting that "one of the Congregation Members, who had been invited to attend . . . was actually charged by the County with Criminal Trespass" arising out of this incident), 105 (same).

Since late 2013, Plaintiffs allege that Defendants' intimidating actions have prevented them from performing their governance duties as Church officers and from visiting the Church and its grounds.[10] Indeed, Plaintiffs argue that "the ability of Defendants to call and have Police come and interrogate Plaintiffs . . . about criminal trespass" on November 15 and 17, 2013 has "made the Plaintiffs and the Congregation fearful to even come to and/or use Kahikolu Church and its facilities." TAC ¶¶ 75, 85, 86(a)–(d), 96; *accord* Dolly Decl. ¶¶ 49, 63, Dkt. No. 25-6 at 21, 24.

---

[10]*E.g.*, Valencia Decl., Ex. E at 1–9 [Pule Decl.] ¶¶ 9(a)(i)–(iii), Dkt. No. 25-6 at 3–4 (describing conduct such as "changing all the locks at Kahikolu so [Plaintiffs'] keys would not work and locking [them] out of the Kahikolu Congressional Church and grave sites"; "improperly withholding keys to Kahikolu's offices, requiring the Plaintiff Officers to request permission just to access Kahikolu"; and "us[ing] of threats, intimidation, harassment, physical violence, bullying, and other such misconduct that were designed to prevent and/or interfere with the proper and legitimate governance of Kahikolu, and to prevent the Plaintiffs from exercising their Civil Rights to worship and visit family grave sites"); Dolly Decl. ¶ 64 (detailing the fiduciary and other governance duties that Plaintiffs been prevented from performing by Defendant's actions); Falemalu Decl. ¶¶ 15, 16(a), 16(c) ("Neither of the other Plaintiffs nor I have been welcome to enter Kahikolu when we needed to do so or to enter the Kahikolu office or Sanctuary, and access has been severely restricted.").

Plaintiffs filed their initial Complaint on February 10, 2014 in the Circuit Court of the Third Circuit, State of Hawaiʻi.  One of the many pre-trial motions that the Circuit Court adjudicated prior to removal was Defendants' Motion to Dismiss or, in the Alternative, for Summary Judgment, which the Circuit Court heard on October 3, 2016 and denied after finding genuine issues of material fact precluding summary judgment (*see* Reply, Ex. A [Tr. of Proceedings (Oct. 3, 2016), Civil 14-1-063K] at 24, Dkt. No. 26-2).  In its order on the motion, the Circuit Court ordered Plaintiffs "to name as a party or parties the law enforcement officer(s) Plaintiffs contend are liable for violation of and/or conspiracy to violate 42 U.S.C. section 1983."  Valencia Decl., Ex. A [Order Denying State Court MSJ] at ¶ 3, Dkt. No. 25-2 at 2.  As a result, Plaintiffs filed an "Ex Parte Motion for Order Identifying Darren Cho and Porter Devries as John Does 9 and 10 and the County of Hawaii as Doe Governmental Unit 1" in Circuit Court on March 17, 2017.  *See* Civil 14-1-063K, Dkt. No. 304.

Citing federal question jurisdiction, the new defendants filed their Notice of Removal (Dkt. No. 1) on April 27, 2017.  But on May 26, 2017, Plaintiffs filed a Notice of Partial Dismissal of the Second Amended Complaint Against Defendants Clifford Medeiros, Jadelyn Medeiros, Darren Cho, J. Porter Devries, and the County of Hawaii (*see* Dkt. No. 17), which eliminated all government-affiliated

defendants previously named in the matter before the instant, federal court. The same day, Plaintiffs also filed their TAC (Dkt. No. 18) asserting seven causes of action against the remaining Defendants, including: Declaratory Relief (Count I; TAC ¶¶ 98–99); Violation of 42 U.S.C. Section 1983 (Count II; TAC ¶¶ 101–13); Intentional and/or Negligent Interference with the Right of Peaceable Worship (Count III; TAC ¶¶ 114–118); Intentional and/or Negligent Interference with the Right to Visit Ancestral Grave Sites, and to Enjoy the Benefits and Honor as Elected Official (Count IV; TAC ¶¶ 119–23); Intentional and/or Negligent Interference with Plaintiffs' Ability to Fulfill Duties and Obligations to Church as Officers and Enjoy Benefits and Honor as Elected Officers (Count V; TAC ¶¶ 124–28); Conversion and/or Misappropriation of Insurance Proceeds (Count VI; TAC ¶¶ 129–36); and Civil Conspiracy (Count VII; TAC ¶¶ 137–42).

Defendants filed their Motion to Dismiss the TAC on June 19, 2017, arguing that: the case is nonjusticiable because it involves church governance; the TAC omits indispensable parties and contains no "government actor" defendants to support Counts II and III; Plaintiffs have no standing to assert Count VI; the TAC contains insufficient facts to support Counts I, IV, V, VI, and VII; Plaintiffs failed to plead the elements of Counts III, IV, and V; and that Counts III and IV are not actionable in the State of Hawai'i. *See* Mem. in Supp. of MTD, Dkt. No. 22-1. Plaintiffs opposed the MTD on July 27, 2017 (Dkt. No. 25); and Defendants filed

their Reply in support of the MTD on August 3, 2017 (Dkt. No. 26). The Court heard oral arguments on August 17, 2017 and took matters under advisement.

After providing the parties with an ultimately unsuccessful opportunity to resolve this matter without further litigation, the Court now GRANTS the MTD as to Counts III, IV, and V, and DENIES the MTD as to Counts I, II, VI, and VII, for the following reasons.[11]

## STANDARD OF REVIEW

*Motion to Dismiss Pursuant to Federal Rule of Civil Procedure 12(b)(6)*

A motion to dismiss under Federal Rule of Civil Procedure ("FRCP") 12(b)(6) challenges a complaint's compliance with the pleading requirements provided by the Federal Rules.

The Court may dismiss a complaint pursuant to FRCP 12(b)(6) for "failure to state a claim upon which relief can be granted" when there is a "lack of a cognizable legal theory or the absence of sufficient facts alleged." *UMG Recordings, Inc. v. Shelter Capital Partners, LLC*, 718 F.3d 1006, 1014 (9th Cir. 2013) (quoting *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990)). In other words, plaintiffs are required to allege "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S.

---

[11]The Court issued an EO on August 29, 2017 (ECF No. 31), advising the parties of its ruling on the present motion, but without offering any reasoning. That reasoning is provided herein.

544, 570 (2007)); *see also Weber v. Dep't of Veterans Affairs*, 521 F.3d 1061, 1065 (9th Cir. 2008). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556). Factual allegations that only permit the Court to infer "the mere possibility of misconduct" do not constitute a short and plain statement of the claim showing that the pleader is entitled to relief as required by FRCP Rule 8(a)(2). *Id.* at 677, 679 (explaining that Rule 8 "does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation").

For purposes of ruling on a Rule 12(b)(6) motion, the court "accept[s] factual allegations in the complaint as true and construe[s] the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008). However, conclusory allegations of law, unwarranted deductions of fact, and unreasonable inferences are insufficient to defeat a motion to dismiss. *See Iqbal*, 556 U.S. at 678 (explaining that the construed-as-true/light-most-favorable tenet "is inapplicable to legal conclusions"); *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001); *Nat'l Assoc. for the Advancement of Psychoanalysis v. Cal. Bd. of Psychology*, 228 F.3d 1043, 1049 (9th Cir. 2000); *In re Syntex Corp. Sec. Litig.*, 95 F.3d 922, 926 (9th Cir.

1996); *Twombly*, 550 U.S. at 555 ("While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations . . . , a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." (internal citations omitted)).  Moreover, the court need not accept as true allegations that contradict matters properly subject to judicial notice or allegations contradicting the exhibits attached to the complaint.  *Sprewell*, 266 F.3d at 988.

## Leave to Amend

Under Rule 15(a) of the FRCP, leave to amend a party's pleading "should [be] freely give[n] . . . when justice so requires."  FRCP 15(a)(2); *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000) (en banc) (explaining that "the underlying purpose of [FRCP] Rule 15 . . . [is] to facilitate decision on the merits, rather than on the pleadings or technicalities") (quoting *Noll v. Carlson*, 809 F.2d 1446, 1448 (9th Cir. 1987)).  "[A] district court should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts."  *Cook, Perkiss & Liehe, Inc. v. N. Cal. Collection Serv. Inc.*, 911 F.2d 242, 247 (9th Cir. 1990) (citing *Bonanno v. Thomas*, 309 F.2d 320, 322 (9th Cir. 1962); *Erlich v. Glasner*, 352 F.2d 119, 122 (9th Cir. 1965)); *Harris v. Amgen, Inc.*, 573 F.3d 728, 737 (9th Cir. 2009)

("Dismissal without leave to amend is improper unless it is clear that the complaint 'could not be saved by any amendment.'") (quoting *Lee v. City of Los Angeles*, 250 F.3d 668, 692 (9th Cir. 2001)) (citing *Chappel v. Lab. Corp. of Am.*, 232 F.3d 719, 726 (9th Cir. 2000)).  Leave to amend may also be denied for "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc." *Mayes v. Leipziger*, 729 F.2d 605, 608 (9th Cir. 1984) (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)).

## DISCUSSION

## I. Plaintiffs May Proceed In Federal Court Despite The Absence Of Local Government Defendants.

In their first argument, Defendants state that the TAC lacks parties that the State court found to be "indispensable" during its October 3, 2016 hearing on the State Court MSJ prior to removal.  Mem. in Supp. at 8–10, Dkt. No. 22-1.  Without the indispensable parties—here, Officer Cho and the County (collectively "Government Defendants")—Defendants insist that the case cannot proceed and must be dismissed.  *Id.*  Plaintiffs respond that they are not required to name the Government Defendants, notwithstanding allegations of a conspiracy involving the Kona police, under federal law set forth in *Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970).  *See* Reply at 12–13, Dkt. No. 26.

Plaintiffs have not offended the state court's order by maintaining their claims only against private individuals.[12] Order Denying State Court MSJ at ¶¶ 1–3, Dkt. No. 25-2. Plaintiffs did not forum shop by following the state court's order below and joining the Government Defendants. Indeed, Plaintiffs were not responsible for removal (*see* Notice of Removal, Dkt. No. 1), and federal law controls.[13]

Under Section 1983, a plaintiff must prove (1) that the defendant has deprived the plaintiff of a right secured by the "Constitution and laws" of the United States, and (2) that the defendant so deprived the plaintiff "under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory," or, in other words, that the "defendant acted 'under color of law.'" *Adickes*, 398 U.S. at 150 (citing *Monroe v. Pape*, 365 U.S. 167, 184, 187 (1961); *United States v. Price*, 383 U.S. 787, 793, 794 (1966)). Here, Defendants argue that the

---

[12]At the October 3, 2016 hearing, the Circuit Court suggested that the Kona police might be an indispensable party, but it still refused to dismiss the action for failure to join the Kona Police. *See* Tr. of Proceedings (Oct. 3, 2016) at 24–26, 30 (explaining that the police would be needed to enforce any injunctive relief, if granted), Dkt. No. 26-2. Nonetheless, in its written Order denying summary judgment, the Circuit Court stated that "there are genuine issues of material fact" and "ordered" Plaintiffs "to name as a party or parties the law enforcement officer(s) Plaintiffs contend are liable for violation of and/or conspiracy to violate 42 U.S.C. § 1983." Order Denying State Court MSJ ¶ 3, Dkt. No. 25-2 at 2.

[13]Moreover, Plaintiffs have not impermissibly added new claims in the TAC. Rather, they were ordered by this court to "clarify . . . that one or more claims are brought under section 1983 and how the non-state actors can be liable under section 1983 under a conspiracy theory." *See* May 12, 2017 Entering Order, Dkt. No. 15. In filing the TAC with a count specifically dedicated to Section 1983 liability and *eliminating* the County Defendants, Plaintiffs complied with the Court's admonition that, in doing so, they "may not add new parties or causes of action. *Id.*

Government Defendants are necessary in order to demonstrate action "under color of law." But in *Adickes v. S.H. Kress & Co.*, the Supreme Court held that "a private party involved in . . . a conspiracy [to violate an individual's constitutional rights], even though not an official of the State, can be liable under § 1983." 398 U.S. at 152.[14]

In that case, a white schoolteacher was first refused service in a private restaurant she visited accompanied by several of her black students and then later arrested for vagrancy. *Adickes*, 398 U.S. 144. The teacher sued the restaurant under Section 1983, alleging that its refusal to serve her and the vagrancy arrest were products of a conspiracy between a private individual (restaurant/Kress) and a governmental entity (local police) to deprive her of the right to equal treatment in a place of public accommodation. *Id*. at 147–48. Despite the absence of governmental defendants, the United States Supreme Court reversed summary judgment against the teacher. In allowing the private party suit to proceed, the Court explained that the teacher-plaintiff would be entitled to relief under Section 1983 if she could prove that an employee of the private restaurant-defendant and a local police officer "somehow reached an understanding" to deny her service in the restaurant or to cause her arrest on impermissible grounds. *Id.* at 152. If such a

---

[14]Whether Plaintiffs have sufficiently alleged enough *facts* to demonstrate that the Defendants were involved in a conspiracy with state actors to violate Plaintiffs' constitutional rights is addressed below. *Infra*, Part III.

showing were made, then "[t]he involvement of a state official in such a conspiracy plainly provides the state action essential to show a direct violation of petitioner's [constitutional] rights, whether or not the actions of the police were officially authorized or lawful." *Id.* Accordingly, "[t]hat the state official[s] [are] no longer in the suit . . . is no defense" to the claims in the TAC. *Howerton v. Gabica*, 708 F.2d 380, 383 n.6 (9th Cir. 1983) (citing *Dennis v. Sparks*, 449 U.S. 24, 28 n.4 (1980); *Adickes*, 398 U.S. at 152); *Johnson v. B.H. Liquidation Corp.*, 1992 WL 79297, at *1 (9th Cir. Apr. 21, 1992) (affirming dismissal of municipal defendants from action under § 1983 but reversing dismissal of private-defendant repossessor and remanding because plaintiff alleged sufficient facts about the private defendant's actions "to clothe the repossession with state sanction").

In sum, Plaintiffs correctly state that they can proceed in federal court on their Section 1983 claims, consistent with *Adickes*, without naming Government Defendants.

## II. The Case Is Justiciable Because It May Be Decided On Neutral Principles Of Law.

"The First Amendment prohibits a civil court from conducting an inquiry into religious laws, beliefs, or internal hierarchy . . . resolving disputes over a religious group's membership requirements (citations omitted) or inquiring into religious disputes (citations omitted)." Mem. in Supp. at 13 (quoting *Congregation Yetev Lev D'Satmar, Inc. v. Kahana*, 31 A.D.3d 541, 542 (N.Y.

App. Div. 2006), *aff'd* 879 N.E.2d 1282 (N.Y. 2007)).  However, the United States

Supreme Court has confirmed that Article III courts do have jurisdiction over legal

disputes that touch on religious matters, so long as they can be resolved by

applying "neutral principles of law."  *See, e.g.*, *Maryland & Virginia Eldership of*

*Churches of God v. Church of God at Sharpsburg, Inc.*, 396 U.S. 397, 367–68

(1970) (en banc) (affirming dismissal where "the [lower] court's resolution of the

dispute involved no inquiry into religious doctrine").

This case involves many issues and claims.  Included among them are

Section 1983 claims involving a trespass and arrest that occurred in November

2013 and "control over the 'religious association property acquired by the

association" before a factional split of the Kahikolu congregation.  Reply at 6, Dkt.

No. 26 (quoting *Trett v. Lambeth*, 195 S.W.2d 524, 531 (Mo. Ct. App. 1946))

(referring to the case as "an ecclesiastical land grab fueled by a large mainland

church").  There is nothing challenging the Court's justiciability of these claims.

According to Defendants, however, this Court lacks jurisdiction to decide

whether or not Macomber is the Church's rightful Kahu where the Plaintiffs'

objections to his status as such are religiously motivated.  Reply at 14, 18.  That,

according to Defendants, is perhaps the principal issue underlying the present

dispute.  While not challenging the import of the issue, Plaintiffs assert that

Macomber's status is justiciable because it has nothing to do with church doctrine.

19

Noting that the Church is a non-profit corporation that is registered and authorized by the DCCA in the State of Hawaiʻi, which has elected principal officers (Plaintiffs), and promulgated its own governing By-Laws, Plaintiffs contend that the validity of Macomber's installation can be determined by reference to neutral principles of law, including Kahikolu's By-Laws, that do not run counter to the First Amendment. Mem. in Opp'n to MTD at 14, Dkt. No. 25.

For example, Defendants claim that all procedures set forth in the 2009 By-Laws were followed, and therefore the congregation's vote to rescind the elections of Pule and Dolly during an October 13, 2013 meeting was valid. They claim that at this meeting, Alan Andrade became the Church's current Moderator. *See* Alan Andrade Decl. ¶¶ 1, 2. As such, Defendants claim that the congregation reaffirmed Macomber as its permanent Kahu during a July 10, 2006 meeting properly noticed and conducted by Alan Andrade. Membership Meeting Minutes (July 10, 2016), Dkt. No. 22-3 at 63–66. Plaintiffs, on the other hand, do not accept the October 13, 2013 election results that allegedly removed them from their respective offices because the Special Meeting was improperly called and/or notice was unreasonable under Hawaiʻi Revised Statutes ("HRS") § 414D-105(a). Although the 2009 By-Laws state that "Special Meetings may be called at any time by the Moderator or by written request by no less than three (3) members, and shall be announced from the pulpit" (2009 By-Laws, Art. XI), Plaintiffs argue that the Church's general

practice has been for the Moderator to call a Special Meeting only after consulting with the other officers and the Church's executive board and then announcing it from the Pulpit at least two weeks prior to the Special Meeting" (*see* Leslie Decl. ¶¶ 8, 9, Dkt. No. 25-6 at 43). Here, however, the written request for the October 13, 2013 Special Meeting to discuss the possible removal of Pule and Dolly is dated October 9, 2013—just four days before the meeting was to take place. *See* Decl. of Counsel, Ex. 1-F [Special Meeting Request (Oct. 9, 2013)], Dkt. No. 22-3 at 39–40.[15] As such, Plaintiffs argue that they retained their respective positions as Church officers, such that Alan Andrade and others are not validly in those roles. Plaintiffs therefore assert that they were authorized to call the Special Meeting on March 3, 2014, at which the congregation purportedly voted to sever all ties with Macomber. *Cf.* Mem. in Opp'n at 17 (explaining that Defendants' conclusion that the 2015 By-Laws are invalid is "false, because Plaintiffs were not removed from office" on October 13, 2013, prior to the creation of those By-Laws). Although the final outcome of such a contracts-based analysis is unclear, it is apparent that the question has nothing to do with church doctrine. Rather, this dispute, and the

[15]In its FOF/COLs (Dkt. No. 22-3 at 10–22), the Circuit Court noted that the members who called the October 13, 2013 meeting "acted in good faith and in accordance with what had been the regular customary practice in the Church" (FOF 32). But the court also concluded "as a matter of law" that Plaintiffs would "be able to prove that the purported Special Meeting on October 13, 2013 was invalid," in part because "the request for the special meeting [here] was made on October 9, 2013 for a meeting that took place on October 13, 2013," which violates the statutory requirement that the notice of a special meeting "must not be less than 10 days" (COL 4). *Id.*

specific issue cited by Defendants, can be decided by this Court using neutral principals of contracts law and state statutes. Mem. in Opp'n at 12 (referring to the Church's 2009 By-Laws, 2015 By-Laws, and HRS § 414D-105(c)(1)).

Defendants rely on the general rule that the First Amendment "prohibits civil courts from resolving church property disputes on the basis of religious doctrine and practice." *Jones v. Wolf*, 443 U.S. 595, 602–04 (1979). Courts are to "take special care not to become too involved in internal religious disputes or implicate secular interests in matters of purely ecclesiastical or religious concerns such as church governance or polity." *Trustees of Diocese of Albany v. Trinity Episcopal Church of Gloversville*, 250 A.D. 2d 282, 286 (N.Y. App. Div. 1999). While the Court understands Defendants concern, these principles do not appear to be in play.

For example, at the August 17, 2017 hearing on Defendants' MTD, defense counsel raised *Matter of Congregation Yetev Lev D'Satmar, Inc. v. Kahana*. In *Kahana*, the court found that it was unable to adjudicate a dispute between two factions over rightful control of the religious institution because of the general rule that directs courts not to interfere in matters affecting the internal governance structure of a religious organization. *Id*. However, the *Kahana* court ultimately determined that it was precluded from deciding the dispute because the religious institution's by-laws conditioned membership on religious criteria. Civil courts

would be unable to evaluate the temple's membership decisions made under its by-laws without consideration of ecclesiastical issues. 879 N.E.2d at 1285–86. For this reason, the court deemed the controversy non-justiciable. *Id.*

In contrast, resolving the central issue in the instant dispute turns on basic questions of contract and statutory interpretation: whether Defendants provided notice of certain meetings in accordance with Church By-Laws; whether such notice was "fair and reasonable" according to HRS § 414D-105(c)(1); and perhaps even which set of competing By-Laws (2009 vs. 2015) controls. None of these questions involves ecclesiastical interpretation in the manner of *Kahana*, and thus, Defendants' reliance on that case is misplaced.

Defendants also invoke *McClure v. Salvation Army*, 460 F.2d 553, 558–59 (5th Cir. 1972), to demonstrate that matters touching the employment relationship between churches and ministers should be treated as ecclesiastical and therefore are nonjusticiable by secular courts. Mem. in Supp. at 14, 18 (discussing the so-called "ministerial exception"). While this is a correct statement of law, the instant case does not call on the Court to decide the relationship between Macomber, as purported Kahu, and the Church itself. Rather, as discussed above, the dispute turns on who the rightful principal officers were during the referenced time periods, and whether the rightful officers properly followed internal and state-mandated procedures in calling meetings and elections, including those relating to

the status of the Kahu.  Thus, *McClure* and other cases examining and defining the ministerial exception are factually distinguishable.

Unlike the authority cited by Defendants, Plaintiffs' comparison of the instant matter to cases like *Tomic v. Catholic Diocese of Peoria*, 442 F.3d 1036 (7th Cir. 2006), *abrogated by Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171 (2012), and *Trett v. Lambeth*, 195 S.W.2d 524, 531 (Mo. Ct. App. 1946), is instructive.

In *Tomic*, the Seventh Circuit considered an age discrimination suit brought by the former music director and organist of a Catholic diocese and ultimately affirmed the trial court's dismissal on jurisdictional grounds.  442 F.3d 1036.  The court explained that although "[f]ederal courts are secular agencies" that "do not exercise jurisdiction over the internal affairs of a religious organization," *id.* at 1037 (collecting examples in support), "[t]he ministerial exception, and the hands-off approach more generally, do not place the internal affairs of religious organizations wholly beyond secular jurisdiction."  *Id.* at 1039.  Indeed, "[i]f a local congregation of a hierarchical sect seized the local church, changed the locks, and declared itself an independent religious organization, a court would, upon suit by the hierarchy, enjoin the seizure."  *Tomic*, 442 F.3d at 1039 (citing *Wolf*, 443 U.S. at 602–03; *Watson v. Jones*, 80 U.S. 679, 726–29 (1871); *Maryland & Virginia Eldership*, 396 U.S. at 367–68; *Church of God in Christ, Inc. v. Graham*,

54 F.3d 522, 525–26 (8th Cir. 1995); *Presbyterian Church in the U.S. v. Mary Elizabeth Blue Hull Mem'l Presbyterian Church*, 393 U.S. 440, 449–50 (1969)). In such a case, the court "cannot always avoid taking a stand on religious questions," for "there might be a dispute over whether, under the internal law of the sect in question, local church property was owned by the congregation or by the sect." *Tomic*, 442 F.3d at 1039. In the end, the *Tomic* court found that the music-director position included religious duties and dismissed the former music director's claims. *Id*. at 1040 (citing *Starkman v. Evans*, 198 F.3d 173, 176 (5th Cir. 1999) (explaining that "[t]he 'ministerial exception encompasses all employees of a religious institution, whether ordained or not, whose primary functions serve its spiritual and pastoral mission," and outlining the three-factor inquiry the court employs to determine who qualifies as a minister—(1) "whether employment decisions regarding the position at issue are made 'largely on religious criteria," (2) "whether the plaintiff was qualified and authorized to perform the ceremonies of the Church," and (3) "whether [plaintiff] 'engaged in activities traditionally considered ecclesiastical or religious'") (quoting *EEOC v. Catholic Univ. of Am.*, 83 F.3d 455, 461 (D.C. Cir. 1996); *EEOC v. Southwestern Baptist Theological Seminary*, 651 F.2d 277, 283 (5th Cir. 1981), *cert. denied*, 456 U.S. 905 (1982) (three-factor test), *cert. denied*, 531 U.S. 814 (2000)).

Here, among other things, the 2009 By-Laws provide that "[t]he Moderator

shall schedule and preside over all meetings of the congregation and the Executive Board" and appoint members of all special committees; the Vice Moderator "shall serve in the capacity of the Moderator in the absence of that officer and shall serve as Chairman of the Finance Committee"; and the Secretary "shall keep faithful and accurate records of all activities of the church and the Executive Board" in addition to conducting Church correspondence. 2009 By-Laws, Art. VII, Dkt. No. 25-3. Plaintiffs and Defendants argue over who the Church's rightful officers are and, as a by-product, whether Macomber is its rightful pastor. These issues turn on the validity of purported election results under the Church's governing documents from votes taken during meetings allegedly complying or failing to comply with those documents and other applicable law. Taking the facts alleged as true, the Court can reasonably infer that Plaintiffs' positions as Church officers were not religious in nature, and therefore the ministerial exception does not apply.

In *Trett v. Lambeth*, the Missouri Court of Appeals confronted a factually similar situation involving a dispute by two factions of an unincorporated religious association with opposing views on matters including internal governance. 195 S.W.2d at 531–533 ("The [dissenters] thought that Conventions and Boards, and especially incorporated Conventions, were flagrant violations of Scriptural teachings."). "[U]nder the leadership of [a minister of the gospel and member of another church nearby]," the dissenting faction withdrew and "affiliated with

another unorganized, unincorporated religious group." *Id*. at 525. Plaintiffs alleged that the dissenters changed the locks on the church doors and "excluded plaintiffs" from the church building and its premises "intend[ing] to permanently drive them" from the church. *Id*. Although they had been forced to hold their meetings elsewhere, the plaintiffs also asserted that the original association had continued to meet, and that plaintiffs had been duly elected as "new trustees" of the church during one of those off-site meetings. *Id*. at 529–30. The dissenter-defendants, in contrast, claimed that the congregation had "severed all relations with church Boards and conventions" by majority vote taken "in the manner and form and according to the rules, practices and customs of said church" during a "business meeting" at the end of a May 22, 1944 church service. *Lambeth*, 195 S.W.2d at 527. The dissenters also claimed that their minister "had been elected moderator by the congregation" and presided over the May 22 meeting, at which the congregation also allegedly "excluded [plaintiffs and others] from said church 'in the manner prescribed by the rules, practices and customs of said church.'" *Id*. at 527–28, 530.

Affirming the trial court's holding "that the meeting on the night of May 22 'was not a duly called special meeting of said church,'" the Missouri Court of Appeals noted that the minister's election as moderator and the decision to exclude plaintiffs from the meeting were procedurally deficient for lack of adequate notice,

among other things.  *Lambeth*, 195 S.W.2d at 532.  The Court explained:

> Whether or not this little congregation . . . shall stay with the convention system or withdraw from it is an ecclesiastical question with which we have nothing to do, but where property and civil rights are involved, it is our duty to determine whether the meeting of May 22, 1944 was of sufficient legality under the doctrines, rules and practice of the . . . congregation to permit the changing of important and long followed doctrines, beliefs and practices, the seizing of the church property, the changing of the lock on the door and the summary excommunication of a great number of its oldest and most faithful members.  It was not a proper meeting of a majority of the members of the [church,] and the learned chancellor was right in so finding.

*Id*. at 534.  Moreover, "[t]he original congregation met in November and elected [plaintiffs] as trustees," which "they had a right to do and those trustees, for themselves and in behalf of the other members, had the right and authority" to file the civil suit.  *Id*. at 535.  As such, the court declared that "[t]he attempted election of trustees by the [dissenters] was, as the attempted exclusion of members, of no effect, and for the same reason" because "[t]hey had no power to act as or for the congregation of the [original association]."  *Id*.

Here, as in *Lambeth*, the parties each purport to have elected their own officers of the Church, and each party argues that procedural deficiencies in Macomber's April 21, 2013 election as Kahu was reversed (Plaintiffs) or affirmed (Defendants) during meetings called by those officers.  *Compare, e.g.*, Falemalu Decl. ¶ 16(d), Dkt. No. 25-6 at 32–33 (describing March 3, 2014 Special Meeting

called by Plaintiffs wherein the congregation voted to sever all ties with Macomber); *with* Special Meeting Minutes (Oct. 13, 2013), Dkt. No. 22-3 at 33–37 (representing that of the 25 attendees, 22 voted to rescind Pule's election as Moderator and 25 voted to rescind Dolly's election as Vice Moderator). These are issues that the Court, perhaps uniquely, is authorized to resolve.[16]

### III. Plaintiffs Allege Sufficient Facts Supporting Defendants Alleged Joint Action With Local Government Actors To Defeat The MTD.

Defendants contend that the TAC fails to sufficiently plead the existence of a conspiracy between Defendants and the Kona police to deprive Plaintiffs of their civil rights in violation of 42 U.S.C. § 1983, and as such, Defendants urge the Court to dismiss Counts II and VII. The Court disagrees.

To state a Section 1983 claim against private individuals such as Defendants, a plaintiff must allege two essential elements: (1) that a right secured by the Constitution or laws of the United States was violated, and (2) that the alleged violation "was committed by a person acting under the color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988) (citations omitted); *accord Howerton* 708 F.2d at 382 (citing, *inter alia*, *Lugar v. Edmonson Oil Co., Inc.*, 457 U.S. 922 (1982)); *see also United Steelworkers of Am. v. Phelps Dodge Corp.*, 865 F.2d

---

[16]As this matter proceeds, if the Court finds itself treading in religious waters of the kind hypothesized by Defendants, the Court reserves the right to reconsider this ruling. *See Billingsley v. Comm'r of Internal Revenue Serv.*, 868 F.2d 1081, 1085 (9th Cir. 1989) ("[T]he court is under a continuing duty to dismiss an action whenever it appears that the court lacks jurisdiction.") (quoting *Augustine v. United States*, 704 F.2d 1074, 1077 (9th Cir. 1983)). The Court only rules that there is no apparent need to do so now.

1539, 1540 (9th Cir. 1989) ("Actions may be brought pursuant to 42 U.S.C. § 1983 to redress constitutional violations under color of state law.").  The ultimate issue in determining whether a private individual is subject to such a claim is whether the alleged infringement of federal rights is fairly attributable to the government. *Sutton v. Providence St. Joseph Med. Ctr.*, 192 F.3d 826, 835 (9th Cir. 1999) (citations omitted).  Private parties such as Defendants may have acted "under color" of state law if they conspired with, or "willful[ly] participa[ted] in joint activity with," state officials to deprive others of their constitutional rights. *Adickes*, 398 U.S. at 152 (holding that private restaurant that denied plaintiff service in violation of federal law would be liable as a state actor under the so-called joint-action test upon proof that it conspired with police officers to deprive plaintiff of her constitutional rights) (citing *Price*, 383 U.S. at 794); *Fonda v. Gray*, 707 F.2d 435, 437 (9th Cir. 1983) ("A private party may be considered to have acted under color of state law when it engages in a conspiracy or acts in concert with state agents to deprive one's constitutional rights." (citations omitted)).

The Hawai'i Supreme Court has defined "civil conspiracy as the "combination of two or more persons or entities by concerted action to accomplish a criminal or unlawful purpose, or to accomplish some purpose not in itself criminal or unlawful by criminal or unlawful means." *F.K. ex rel. A.K. v. Dep't of Educ.*, 2012 WL 5438989, at \*7–8 (D. Haw. Nov. 7, 2012) (quoting *Robert's Haw.*

*Sch. Bus, Inc. v. Laupahoehoe Transp. Co.*, 982 P.2d 853, 881 n. 28 (Hawai'i 1999) (emphasis added), *superseded by statute on other grounds as stated in Haw. Med. Ass'n v. Haw. Med. Serv. Ass'n, Inc.*, 148 P.3d 1179 (2006)).  Whether defendants were involved in an unlawful conspiracy turns on the individual facts of each case.  *See Howerton*, 708 F.2d at 383 ("Only by sifting facts and weighing circumstances can the nonobvious involvement of the State in private conduct be attributed its true significance." (quoting *Burton v. Wilmington Parking Auth.*, 365 U.S. 715, 722 (1961)) (internal quotation marks omitted)); *Johnson*, 1992 WL 79297, at *1 (noting that "police involvement in repossession of an automobile can constitute a conspiracy and make the private repossessor liable under § 1983" if "the police actively assisted the repossessor but not if they stood by passively" (citations omitted)).  As such, the issue "should be resolved by the jury, 'so long as there is a possibility that the jury can "infer from the circumstances (that the alleged conspirators) had a 'meeting of the minds' and thus reached a[n] understanding" to achieve the conspiracy's objectives.'"  *Mendocino Envtl. Ctr. v. Mendocino Cty.*, 192 F.3d 1283, 1302 (9th Cir. 1999) (quoting *Hampton v. Hanrahan*, 600 F.2d 600, 621 (7th Cir. 1979), *reversed in part on other grounds*, 446 U.S. 754 (1980)); *see also Franklin v. Fox*, 312 F.3d 423, 441 (9th Cir. 2002) (emphasizing importance of demonstrating "an agreement or 'meeting of the minds' to violate [the Plaintiffs'] constitutional rights" (quoting *United*

*Steelworkers of Am.*, 865 F.2d at 1540–41)).  Such an agreement "may be inferred on the basis of circumstantial evidence such as actions of the defendants."  *Crowe v. Cty. of San Diego*, 608 F.3d 406, 440 (9th Cir. 2010) (citing *Mendocino*, 192 F.3d at 1302 ("[I]t will almost always be necessary to infer such agreements from circumstantial evidence or the existence of joint action.")).  To be liable, "each participant in the conspiracy need not know the exact details of the plan, but each participant must at least share some common objective of the conspiracy."  *United Steelworkers of Am.*, 865 F.2d at 1541 (citing *Fonda*, 707 F.2d at 438).  "Evidence that police failed to exercise independent judgment," for example, will "support an inference of conspiracy" with a private party for Section 1983 purposes.  *Id.*, 865 F.2d at 1540–41 (citing *Gramenos v. Jewel Cos., Inc.*, 797 F.2d 432, 435–36 (7th Cir.1986), *cert. denied*, 481 U.S. 1028 (1987); *Moore v. Marketplace Rest., Inc.*, 754 F.2d 1336, 1352–53 (7th Cir.1985)).

In the TAC, Plaintiffs allege that Defendants are each jointly and severally liable for having conspired with state actors to "prevent and interfere with Plaintiff's rights," including Plaintiffs': "rights (as elected [Church] Officers . . . ) of access to and use of [Church property]," their "rights to perform their duties and to enjoy the benefits, honor, and privileges as the elected Officers," the "rights to peaceably worship and practice their faith" at the Church, and their "rights to visit their ancestral grave sites."  TAC ¶¶ 138, 140.  Plaintiffs assert that "at

32

Macomber's direction and/or approval and/or with his knowledge," other Defendants "call[ed] the Kona Police and ha[d] them come to Kahikolu to interrogate the Plaintiffs and the Congregation" so as to intimidate them. TAC ¶ 56. One such incident allegedly occurred in mid-November 2013 relating to a meeting that Plaintiffs had scheduled to discuss Macomber's failure to seek approval of Church projects.[17]

More specifically, Plaintiffs allege that Officer Cho asked Dolly to travel to the police station on November 14, 2013 under the pretext of preparing for a court hearing scheduled for the morning of November 15. TAC ¶¶ 57, 62; Dolly Decl. ¶ 44 ("I believe that [Officer Cho's] request was just a pretext so he could intimidate me to cancel the meeting because his questions related to our scheduled meeting the following evening at Kahikolu Church, (which he characterized as a trespass), rather than discussing the Hearing on the Assault and Battery that [Dolly] had suffered."). "[I]nstead of discussing the [upcoming] Court Hearing," however, "[Officer Cho] had been advised about and began to question" Dolly about the planned November 15, 2013 meeting regarding Macomber. Dolly Decl. ¶ 41, Dkt. No. 25-6 at 19 ("It was clear that [Officer Cho] had seen the letter that the [Plaintiffs] had sent on November 4, 2013 as a written notice of and invitation

---

[17]This November 2013 meeting was noticed in accordance with the 2009 By-Laws, but only if Plaintiffs' officer positions were not validly rescinded on October 13, 2013, as Defendants contend (*see* Special Meeting Minutes (Oct. 13, 2013), Dkt. No. 22-3 at 33–37).

to all Members to meet on November 15, 2013, the following night at Kahikolu Church."). According to Plaintiffs, when Officer Cho informed Dolly that Plaintiffs "had no right to enter Kahikolu Church and would be trespassing," she presented him with documents proving Plaintiffs' alleged status as Church officers. Dolly Decl. ¶ 43; TAC ¶¶ 63, 64. Specifically, Plaintiffs state that Dolly showed/gave the police copies of the 2009 By-Laws, the Church's DCCA records listing Plaintiffs as officers, and minutes from their March 24, 2013 election. TAC ¶ 63.

Therefore, Plaintiffs claim that "Officer Cho and/or the Kona Police knew or should have known, based on the [documentary evidence received] and Officer Cho's discussions with Plaintiff Andrade, that the Plaintiffs, as Principal Officers, could not be trespassing by entering the Kahikolu property pursuant to written invitation." TAC ¶ 66. Indeed, according to Dolly, "Officer Cho's conduct [at the police station] was very intimidating to [her], because it was clear that he would support the Defendants' position that [Plaintiffs] were trespassing" if they entered the Church grounds. Dolly Decl. ¶ 44. And apparently, he did.[18]

---

[18]In response to Defendant Darryl Grace Sr.'s November 15, 2013 9-1-1 call reporting a trespass on Church grounds, Officer Cho and other police officers traveled to the Church, disrupting Plaintiffs' meeting, interrogating various members of the congregation, and ultimately writing a police report leading to charges of criminal trespass being lodged against one of the meeting invitees. TAC ¶¶ 66, 69–70. *See* Compl., *Andrade v. Cho*, 1:16-cv-00684-DKW-KJM (filed Dec. 30, 2016), ECF No. 1 (action by meeting invitee and Dolly's sister, Dr. Naleen Andrade, against many of the same defendants named herein).

From these allegations, Plaintiffs assert "that police failed to exercise independent judgment" regarding Plaintiffs' authority to be present on Church property (TAC ¶ 65), *see United Steelworkers of Am.*, 865 F.2d at 1540–41 (citations omitted), and that they acted in conspiracy with the Defendants "to prevent Plaintiffs from attending a duly called Meeting at Kahikolu, by repeatedly using law enforcement officers to harass, intimidate, and threaten [them] with possible criminal charges" (TAC ¶ 103).

At this stage in the litigation, the above-summarized facts "show sufficient assistance to clothe [Defendants' intimidating behavior to prevent Plaintiffs from entering Church property] with state sanction," *Johnson*, 1992 WL 79297, at *1 (affirming dismissal of municipal defendants from action under § 1983 but reversing dismissal of private-defendant repossessor and remanding because plaintiff's "allegations that the police initiated the repossession, surrounded [plaintiff's] home, and threatened to arrest her if she resisted show sufficient assistance to clothe the repossession with state sanction").[19]

---

[19]*Compare, e.g.*, *Lugar*, 457 U.S. at 941 (alleging that private parties invoked the aid of state officials "to take advantage of state-created attachment procedures" was sufficient to demonstrate joint action where plaintiffs also alleged that "the State has created a system whereby state officials will attach property on the *ex parte* application of one party to a private dispute"); *and Howerton*, 708 F.2d at 383 n.6 (finding that husband-and-wife defendants acted under color of law by directly engaging the police to aid them in evicting the plaintiff-tenant where the evidence showed that defendants "deliberately cloaked themselves with the authority of the state in effecting repossession of the trailer premises"); *with F.K. ex rel. A.K.*, 2012 WL 5438989, at *8 (finding DOE's pleadings, which stated only that the other parties "conspired," to be deficient for failing to plead a single fact to show the formation of any agreement or

Accordingly, Counts II and VII survive.

## IV. The Remaining Issues.

### A. Equitable Relief Is Available.

Count I of the TAC is a mislabeled claim for injunctive relief.[20] "An injunction should issue only where the intervention of a court of equity 'is essential in order effectually to protect property rights against injuries otherwise irremediable.'" *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982) (quoting *Cavanaugh v. Looney*. 248 U.S. 453, 456 (1919)). In other words, Plaintiffs must demonstrate that "the act complained of will inflict upon them some irreparable injury" or threatens to immediately do so if the Court does not act. *United Fuel Gas Co. v. R.R. Comm'n of Ky.*, 278 U.S. 300, 310 (1929); *see also Brown v. Hawaii*, 2009 WL 3818233, at *7 (D. Haw. Nov. 13, 2009) ("In order to

---

conspiracy, and therefore plaintiffs would be subject to summary judgment (citing *Twombly*, 550 U.S. at 555)); *and Brunette v. Humane Soc'y of Ventura Cty.*, 294 F.3d 1205, 1212 (9th Cir. 2002) (explaining that "[t]he generalized allegation of a wink and a nod understanding between the Media and the Humane society does not amount to an agreement or a conspiracy to violate [plaintiff]'s rights in particular" where plaintiff "alleged that an amorphous longstanding custom facilitated the Media's presence" during the search in question, but where the media had not participated in discussions about plaintiff prior to the issuance of the warrant and, in fact, had no knowledge of the plaintiff or the specific complaints against her until the imminent execution of the search warrant).

[20]Plaintiffs request that the Court order the Defendants to act or to restrain from acting in certain ways in their TAC. *See* Black's Law Dictionary (10th ed. 2014) (defining *declaratory relief* as "[a] unilateral request to a court to determine the legal status or ownership of a thing," and defining *injunction* as "[a] court order commanding or preventing an action"); *cf. F.K. ex rel. A.K.*, 2012 WL 5438989, at *4 ("Under federal law, declaratory relief is a remedy, not a claim.") (citing *Buck v. Am. Airlines, Inc.*, 476 F.3d 29, 33 n.3 (1st Cir. 2007); *In re Joint E. & S. Dist. Asbestos Litig.*, 14 F.3d 726, 731 (2d Cir. 1993)).

. . . obtain injunctive relief, [plaintiff] must make a showing of irreparable harm")

(citing *Reno Air Racing Ass'n, Inc. v. McCord*, 452 F.3d 1126, 1137 n.10 (9th Cir.

2006)).  Defendants argue that Plaintiffs have failed to make such a showing in this

case.

During the August 17, 2017 hearing on the MTD, Defendants argued that

members of the public are welcome to use Kahikolu Church, and that there is a

procedure for extending such access.  *See also* Reply at 5–6 ("Plaintiffs are no

longer officers and as members of the public are welcome to use the church

premises like all others who follow the proper procedures for reserving the church

buildings for events or to visit gravesites.").[21]  As a result, there is no need for the

Court to issue a directive affording Plaintiffs rights they already have.  Defendants

further assert that the pleadings fail, because rather than alleging that they are

barred from the Church property altogether, Plaintiffs have described a single

incident in 2013 regarding visitation of gravesites without ongoing harm.  Mem. in

Supp. at 12.

Defendants' assertions, however, mischaracterize the nature of Plaintiffs'

claims.  Plaintiffs' alleged injuries are both ongoing and unlikely to cease without

legal intervention.  *See Armstrong v. Davis*, 275 F.3d 849, 860–61 (9th Cir. 2001)

---

[21]Plaintiffs, however, strongly contest this.  *See Manzarek*, 519 F.3d at 1031 (noting that on a motion to dismiss, the court assumes validity of the allegations in the pleadings).

("[W]here, as here, a plaintiff seeks prospective injunctive relief, he must demonstrate 'that he is realistically threatened by a repetition of [the violation].'") (quoting *City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983)); *LaDuke v. Nelson*, 762 F.2d 1318, 1324 (9th Cir.1985) (holding that plaintiff must show a "likelihood of similar injury in the future"). For example, Plaintiffs state that they *continue to be* deprived of their status, and prevented from performing their fiduciary duties, as officers[22]; that they "and many of the Members of the Congregation have been prevented from entering" the Church's buildings (including restrooms) and grounds (including ancestral grave sites) (*see* TAC ¶¶ 86(d), 96(i)–(v)); and that Defendants have misused (and continue to misuse) insurance money earmarked for the Church to fund their own defense in this action.[23] Plaintiffs also allege that they "have held worship services at locations other than at Kahikolu since December 2013, even though those locations were not of sufficient size or conveniently located; and Plaintiffs have done so out of fear

---

[22]For example, all three Plaintiffs remain locked out of the Church's office; and Defendants have refused to give Falemalu a key to the Church's mailbox despite her duty as Secretary to maintain records and conduct Church correspondence. TAC ¶¶ 71, 72, 86(a)–(c).

[23]Specifically, Plaintiffs assert that "Defendants improperly made a claim against [the] Church's insurance policies with Church Mutual Insurance Company . . . even though Plaintiffs have not sued [the] Church, and . . . Macomber is neither an officer nor a director . . , was never installed . . , and has no independent contract or Covenant with [the Church]." TAC ¶ 93. Church Mutual denied some coverage, but "agreed to cover" Macomber's attorneys' fees "under the legal defense coverage." TAC ¶ 94. Plaintiffs argue that, "[b]y paying their debts to [Macomber's former attorney], Defendants converted and/or used [the] Church's insurance proceeds from the insurance policy" to pay their legal fees. TAC ¶ 95.

that they might be arrested and/or charged with criminal trespass if they held services at Kahikolu."  TAC ¶ 110.

Therefore, Count I's claim for injunctive relief survives the MTD.

B.     Plaintiffs Were Not Required To Name Church As Defendant.

Defendants argued at the August 17, 2017 hearing that Plaintiffs should have named Kahikolu Church as defendant because they, as individual defendants, cannot give Plaintiffs the relief they want.  Plaintiffs' entire action, however, rests on the premise that "Defendants are not the Church," and that "Plaintiffs (not Defendants) are the formally elected Church officers."  Mem. in Opp'n at 18, Dkt. No. 25.  Accordingly, any action naming "Kahikolu Church" as a defendant would undermine Plaintiffs' essential theory of the case.

Moreover, Plaintiffs have asked the Court to order Defendants to honor Plaintiffs' alleged positions as officers of the Church and to restore their unbridled access to church premises, among other things.  *See, e.g.*, TAC ¶¶ 99(i)–(iv) (requesting that the Court order Defendants to provide a full set of keys to each Plaintiff, restore Plaintiffs to their elected offices under the 2015 By-Laws, "remov[e] Defendant Macomber from all of his claimed positions and responsibilities" at the Church, and issue "a judgment restraining Defendants from any further interference with Plaintiffs' access and use of Kahikolu and its facilities and/or any further intimidation, bullying, and/or threats of any nature").

It is unclear from the record why Defendants suggest that they would be unable to take these actions, if so ordered. The TAC is therefore not deficient for failing to name "Kahikolu Church" as a defendant.

      C.      <u>Plaintiffs Have Standing to Assert Their Claim for Conversion Or Misappropriation of Insurance Proceeds.</u>

Defendants argue that Plaintiffs may not claim insurance proceeds because they are not "representatives of the Church," and "[i]t is not Plaintiffs who would have been damaged by the acts alleged." Mem. in Supp. at 27, Dkt. No. 22-1. The TAC, however, is sufficient to establish Plaintiffs' Article III standing to bring this claim.

A plaintiff must demonstrate three elements to establish Article III standing:

> (1) An injury in fact, that is, an invasion of a legally protected interest that is concrete and particularized, as well as actual or imminent; (2) a causal relationship between the injury and the challenged conduct; and (3) a likelihood that the injury will be redressed by a favorable decision.

*R.G. v. Koller*, 415 F. Supp. 2d 1129, 1135 (D. Haw. 2006) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992) ("[E]ach element must be supported . . . with the manner and degree of evidence required at the successive stages of litigation.") (citations omitted)). "At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we 'presum[e] that general allegations embrace those specific facts that are necessary to support the claim.'" *Defenders of Wildlife*, 504 U.S. at

561 (citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 889 (1990)).

Here, Defendants argue that Plaintiffs cannot satisfy the standing requirements because, essentially, Plaintiffs' terms as officers of Kahikolu Church expired no later than 2015, two years following their election. Mem. in Supp. at 27. However, Plaintiffs counter that on or about February 28, 2015, Kahikolu Church's By-Laws were amended to extend the terms of the officers "until a specific time period after the final resolution of this litigation." TAC ¶ 16. As such, Plaintiffs claim that they are the lawful representatives of the Church, and in that capacity, they are entitled to seek an injunction against the ongoing harms to Church resources. *See* Pule Decl. ¶¶ 9(a)(1)–(iii); Dolly Decl. ¶ 64; Falemalu Decl. ¶¶ 15, 16(a), 16(c).

Because the Court must "accept factual allegations in the complaint as true" and construe the pleadings in the light most favorable to the nonmoving party on a motion to dismiss, *Manzarek*, 519 F.3d at 1031 (discussing the standard for Rule 12(b)(6) motions to dismiss), the TAC sufficiently establishes Plaintiffs' standing to assert Count VI.

D.   The Separate Tort Claims Are Not Recognized By Hawaiʻi Law.

The TAC includes three tort claims—for intentional and/or negligent interference with the right to peaceable worship (Count III); intentional and/or negligent interference with the right to visit ancestral grave sites, and to enjoy the

benefits and honor as elected officials (Count IV); and intentional and/or negligent interference with Plaintiffs' ability to fulfill duties and obligations to church as officers and enjoy benefits and honor as elected officials (Count V).  Plaintiffs have offered no authority that these allegedly independent torts are recognized as such under Hawai'i law.  And at the August 17, 2017 hearing on the instant motion, Plaintiffs conceded that they have found none.  Moreover, Plaintiffs acknowledged that the tort allegations underlying Counts III, IV, and V of the TAC are properly subsumed into Count I and may form the basis for injunctive relief.

Accordingly, the Court GRANTS the MTD as to Counts III, IV, and V to the extent these counts intended to assert independent tort claims against Defendants.

//

//

//

//

//

//

//

//

//

//

## <u>CONCLUSION</u>

For the foregoing reasons, Defendants' Motion to Dismiss the Third

Amended Complaint Filed May 26, 2017 (Dkt. No. 22) is GRANTED as to Counts

III, IV and V to the extent those counts intended to assert independent tort claims

against Defendants.  The motion is DENIED in all other respects.

IT IS SO ORDERED.

DATED: January 2, 2018 at Honolulu, Hawaiʻi



Derrick K. Watson
United States District Judge

*Pule v. Macomber*, CIV. NO. 17-00193 DKW-KJM, **ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS THE THIRD AMENDED COMPLAINT FILED MAY 26, 2017**

43